Filed 10/9/15  In re Vanessa C. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re VANESSA C., a Person Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,  Plaintiff and Respondent,  v.  SCOTT C.,  Defendant and Appellant. | A143897  (Humboldt County Super. Ct. No. JV140133) |

The juvenile court took jurisdiction over Vanessa C. under Welfare and Institutions Code section 300, subdivisions (a), (b), (c), and (d),[1] and removed her from the custody of her presumed father, Scott C. (Father).  At the conclusion of a contested disposition hearing, the juvenile court placed Vanessa with her mother (Mother), pursuant to section 361.2.[2]  Father appeals from the disposition order, contesting the

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Section 361.2, subdivision (a), provides, in relevant part:  "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child.  If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

1

court's failure to order reunification services. He also asserts the court failed to ensure proper inquiry and notice under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.). We reject both arguments and affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

*Section 300 Petition*

On August 18, 2014, the Humboldt County Department of Health and Human Services (the Department) filed a juvenile dependency petition on behalf of Vanessa, who was 12 years old and had been living with Father. The petition alleged Vanessa came within subdivisions (a), (b), and (c) of section 300. Specifically, on August 12, Father allegedly threw a two-shelf, wooden bookcase across the room, striking Vanessa on her left foot, causing swelling, bruising, and a laceration approximately an inch long. Vanessa also reported that, on a number of occasions, Father grabbed her by the arms and torso, forced her into a wall or piece of furniture, and pinned her in place with his body weight. He also previously struck Vanessa in the face with a hard-cover book, causing a bloody nose.

Father also allegedly failed to seek medical attention for Vanessa's injured foot.[3] Vanessa was suffering anxiety and depression, as evidenced by her behavior during interviews with a therapist and social worker. Vanessa also told a social worker that when Father physically restrained her by pushing her up against a wall and holding her there, he would mimic punching her in the face with a closed fist. It was further alleged that Father often called Vanessa names and belittled her and made disparaging comments about Mother. The police were asked to respond after Father stormed into the therapist's office, acting on suspicion Vanessa was disclosing abuse, and screamed and cursed at Vanessa.

*Detention Report*

The detention report indicated that neither parent reported Indian heritage. The Department informed the court of 21 prior child welfare referrals regarding Father.

---

[3] It was eventually determined that Vanessa's ankle had been sprained.

When interviewed by the social worker, Father denied the allegations. Father reported Vanessa dropped the bookcase while he was in another part of the house. Father believed Vanessa and Mother were manipulating the system.

*Detention Hearing*

At the detention hearing, Father informed the court that his father was one eighth Shawnee. He acknowledged that neither he nor Vanessa were enrolled in any federally recognized tribe. The court found ICWA did not apply "at this time." Vanessa was detained and placed with Mother. Visitation with Father was denied as detrimental. After the detention hearing, Father filed a parental notification of Indian status form, indicating that he might have Indian ancestry via a Shawnee tribe.

*Amended Petition*

An amended petition, filed on October 10, 2014, repeated the section 300, subdivision (a), (b), and (c) allegations and added a subdivision (d) allegation. According to Mother, Father admitted that he sexually molested his daughter, Lisa M., when she was 7 years old. Another daughter, Laura H., also reported Father sexually abused her and her sister (Rebecca H.) for many years, starting when Laura was 13 years old. The amended petition asserted that Vanessa had been sexually abused by Father or was at substantial risk of being sexually abused, as indicated by Father's history of sexually abusing minors in his care and Vanessa's spontaneous exclamation at an emergency room, "You're raping me, just like my dad!"

*Jurisdiction Report*

The Department's jurisdiction report concluded ICWA did not apply and Vanessa had been physically and emotionally abused by Father. The Department requested the court sustain the petition. An addendum to the jurisdiction report provided that Lisa M. had reported sexual abuse by Father, and noted referrals alleging Father was involved in a sexual relationship with a 16-year-old, Cassie F, who was once placed in his home.

*Jurisdiction Hearing*

At the jurisdiction hearing, Susan H. testified she lived with Father for about 20 years, beginning in 1980, with her two daughters (Laura and Rebecca). Susan

3

witnessed physical abuse by Father, mainly against herself and "[o]nce in a while" against her daughters. She was also aware of Father's sexual abuse of Rebecca and Laura. Susan said Father was very controlling and if someone disagreed with him, they would be "payin' for it," physically. Susan acknowledged that after she had been forcibly thrown out of Father's house, she used methamphetamine, but said she had not used drugs for about a year.

Vanessa, who was almost 13, testified in front of her parents that Father pushed the bookshelf onto her. He did so because he thought she had thrown something at him. She had actually tossed something into a basket near him. Vanessa also said Father grabbed her arms or upper body when he was mad. After the bookshelf incident, Father grabbed her arm and pulled her or dragged her, shoved her nose into the wall, and grabbed her again as she tried to get away, and had sat her into a chair. He "raged" about 10 times during the last year.[4] Vanessa said when Father got mad, he would scream at her, swearing and calling her names. Twice, Father hit her with his leather belt, leaving red marks. In the past year, he also hit her in the face with a book and gave her a bloody nose.

Laura testified that she lived with Father from the first grade until she turned 18. Father used to hit her, using both his hands and objects. Father also sexually abused her, starting when she was about 12 and continuing daily until she moved out. Laura also observed Father sexually abusing her sister, Rebecca, starting when Rebecca was 10 or 11. Although Laura's allegations were eventually reported to police, there had been no prosecution.

Jamie H. testified that she lived in Father's house from December 22, 2013, until April 23, 2014. Jamie paid $400 per month to live in a bedroom right across from Vanessa's room. On February 19, Jamie saw Father punch Vanessa in the face with a book and bloody her nose. Jamie also saw Father hit Vanessa in the back of her head

---

[4] "Rage" to Vanessa meant "[b]eing out of control," "just all over the place," "[m]aking chaos," "throwing stuff," and "being angry."

with a closed fist.  Vanessa came to Jamie's room afterwards, with blood all over her, and asked if her nose was broken.  In April, after Father refused to let Jamie help Vanessa with her homework, she heard screaming and Father hitting Vanessa.  Jamie heard Father call Vanessa worthless, fat, stupid, and lazy almost every day.  Three days after the Department removed Vanessa, Jamie was locked out of the home.  Jamie acknowledged being upset with Father for locking her out and keeping some of her belongings.[5]

Father testified that he was a student at Humboldt State University, studying for a masters degree in social work.  Father said he asked Vanessa to clean her room and the bookcase fell on her.  Father was upstairs when it happened, but went into Vanessa's room and removed the bookcase from her foot.  He felt for broken bones, manipulated her foot, and offered her Neosporin and ice packs.  Father also denied yelling and cursing at Vanessa, or anyone else, at the therapist's office.  He made the appointment to address Vanessa's depression.

Father acknowledged he lived with Susan H. from about 1981 until about 1990.  At the time, Susan was suffering from a traumatic brain injury, a broken neck, and substance abuse problems.  Father had been her caretaker and her representative supplemental social security income payee.  Father denied having had any sexual relationship with either Laura or Rebecca.  Father further denied having physically abused Laura, yelling inappropriate things at Vanessa, physically striking Vanessa, or hitting Vanessa in the face with a book.  Laura had falsely claimed he molested her because she wanted the supplemental social security income and foster care money he received and because Susan had turned against him.  Father believed Cassie F. was 19 when he first had sex with her.

Father's daughter Lisa testified she lived down the street from Father.  Vanessa visited the evening of the injury to her foot and explained she dropped a bookshelf.

---

[5] According to Father, Jamie never lived in his house, but he allowed her to keep some things at his home for a few months.  He eventually asked Jamie to remove her belongings and she then filed a complaint against him with the Department of Fair Housing and Employment.

Vanessa showed Lisa a little red mark that did not appear to require medical attention, laughed it off because she was prone to accidents, and did not say she was afraid to return home. Father called Lisa from the therapist's office the day of that incident and, when she arrived, Father appeared calm. Lisa said Father never sexually abused her. Vanessa had become more defiant in the last year. She was verbally abusive to other students at school, to Father, and to other family members. Father's disciplinary techniques were not working, but Lisa never saw him physically discipline Vanessa. Lisa thought Vanessa just wanted to live with Mother.

Don M. testified he and Father had been friends for over 20 years. Don lived in Father's home for about four years, until June 2014. He left because "it was getting a little stressful." He "started to . . . get the uneasy feeling that something was about to happen and [he did not] want to be in the middle of it." Don was also afraid that he might be falsely accused of something. He heard Father raise his voice to Vanessa if she was not doing her chores or her homework. Father also gave her time outs. If Vanessa kept misbehaving, Father would reluctantly give her a spanking, but Don had not seen anything like that in the last two years. He said Vanessa had a reputation for being dishonest. Don thought Vanessa was trying to find a way to go live with Mother.

### Jurisdiction Findings

The court sustained the amended petition, finding by clear and convincing evidence that Vanessa was described by section 300, subdivisions (a), (b), (c), and (d). The court said the differing versions of events could not be reconciled, that credibility was of utmost importance in the case, and—considering the witnesses' credibility—it was sustaining the petition "in all regards." The court set a disposition hearing.

### Disposition Report

The Department's initial disposition report, received by the court on January 13, 2015, indicated Vanessa remained living with her mother and that no new information regarding Native American ancestry had been reported. Mother reported Vanessa was angry and frustrated and, as a result, Mother secured counseling to help support her.

Vanessa was said to miss Father at times, but said she did not want to see or be alone with him. Vanessa also missed her old friends and familiar things from when she lived with Father. She was cutting classes, disrupting the classroom, and sometimes refusing to do her homework. Neither Vanessa nor Mother felt that counseling was helping.

The Department said Father blamed Vanessa or others for his current circumstances rather than acknowledging any accountability. Father never inquired about visiting with Vanessa or about her well-being. He failed to acknowledge her recent birthday. The Department recommended no reunification services be provided to Father, as they were not in Vanessa's best interest. It recommended that Vanessa be placed with Mother and Mother be provided with family maintenance services.

An addendum report, received by the court on February 20, 2015, noted Vanessa was having secret contact with Father. Vanessa recanted the allegations against Father and said she wanted to live with him because he was less strict. She had been suspended from school for smoking marijuana. The Department further reported that, on February 11, Vanessa ran away and told police Mother had been drinking and abused her. The claims were found to be untrue. Again, on February 15, Vanessa attempted to leave Mother's care. Mother, with the help of police, got Vanessa back home. Later that evening, Vanessa informed Mother that she had taken "55 ibuprofen" and said, "if I can't li[v]e with my father, I don't want to live at all." Mother took Vanessa to the emergency room, where she was held pursuant to section 5150. In light of these developments, the Department recommended that Vanessa be permitted four hours per week of supervised visitation with Father "to help Vanessa have a safer and healthier way of contacting [Father]."

*Contested Disposition Hearing*

After a number of continuances, the disposition hearing began on March 10, 2015. Vanessa testified outside the presence of her parents that she wanted to return to Father's care because she did not think she was safe with Mother. Mother's husband smoked marijuana and drank. Vanessa said she was a "little bit" afraid of Mother's husband

7

because he had been to prison, yelled a lot, called her fat, and made negative comments about women.  On one occasion, Mother's husband yelled at Mother, calling her a "F-ing B."  Vanessa also said Mother hit her in the face with an open hand.  It was the first time Mother hit her.  Vanessa said she was bothered by Mother going through her room and belongings and called Father thereafter.  Vanessa said Mother set up counseling for her with a new therapist, but she did not like going.

Vanessa stated the bookcase incident had not happened.  She only said it had because Jamie suggested it and Vanessa wanted to live with Mother at the time.  When she ran away from Mother's house, she went to Don M.'s house and called Father.  Father knew that he was not supposed to be talking to her but did so anyway.  Father never touched her in a sexual manner.

Social worker Seth Duvernay believed Vanessa had been intimidated to change her story and that she wanted to go where the rules were less strict.  Duvernay never saw any indication of Mother drinking alcohol or of any violence in her home.  Duvernay had concerns about Vanessa returning to Father because of the previous pattern of violence.  Duvernay acknowledged Vanessa could have made up the original allegations against Father, but he did not think it was likely.

Duvernay spoke with Mother on the day Vanessa said she was drinking and there was no indication Mother had, in fact, been drinking.  Mother worked at an alcohol and drug treatment program and had been sober for quite some time. Duvernay understood that Mother had only gone through Vanessa's room and belongings after Vanessa was suspended for smoking marijuana.  Vanessa said she made things up about Mother because she thought she could go live with Father.  Duvernay looked at the ibuprofen incident as more of a gesture and evidence of Vanessa's emotional dysregulation than an actual suicide attempt.  It was unclear whether Vanessa actually took 55 ibuprofen pills, and her stomach was not pumped.  Mother absolutely showed appropriate concern for Vanessa and good insight into her emotional instability.  There was no indication that Vanessa's emotional dysregulation was caused by anything in Mother's home.

Duvernay believed a no-contact order between Father and Vanessa would send Vanessa into a "tail spin." In his opinion, some of the problems could be alleviated by providing supervised visitation between the two; however unsupervised contact would be detrimental at that time.

Rebecca H. testified that Vanessa called her after running away. Vanessa was crying about how unhappy she was and wanted Father. Rebecca told Vanessa that she needed to call the police and tell them what going on at Mother's home. Vanessa said Mother and her husband were constantly yelling at her and threatening to kick her out. One day, Vanessa came home and found her things packed.[6]

*Argument and Disposition Order*

The court found a substantial risk to Vanessa in Father's care, but concluded the evidence showed "absolutely no . . . risk or detriment" to Vanessa from placement with Mother. The court noted substantial corroborative evidence to support the jurisdictional findings, which had been made by clear and convincing evidence. In contrast, no evidence corroborated Vanessa's current claims about Mother's home. The court further concluded that, although Vanessa could not be safely returned to Father's home, Father "should have contact with [Vanessa]." The court said that while visitation needed to be supervised at the outset, "[a]t a point that supervisor, therapist believes appropriate, it could well go to unsupervised," and then, hopefully, go to a "normalized father-child-mother relationship" and "coparenting."

Father's counsel pointed out that section 361.2 permitted the court, in its discretion to provide services to Father while Mother received family maintenance services. The court responded: "I'll do that." Specifically, the court said, "[Father will] be offered—he's going to need to participate in individual counseling and therapeutic counseling with Vanessa." When Father's counsel requested a case plan be developed, the court suggested "doing that with the social worker, making recommendations . . . and that it

---

[6] Duvernay testified, in rebuttal, that he spoke with Vanessa after she ran away and Vanessa said nothing about Mother threatening to kick her out.

9

would be fairly straightforward:  [Father] participating in individual counseling.  Then at a point when Vanessa is ready through her counselor, participating in counseling, taking a parenting class would be just somewhat usual things.”

County counsel interjected that the Department was not recommending services for Father.  The court responded, “But they can be provided.”  The court explained that the social worker had been “absolutely correct” that “driv[ing] a wedge” between Father and Vanessa would not help her because she needed to “be able to choose the future” of her relationships with each parent for herself.  The court made clear it did not think it was “in Vanessa’s best interest to simply cut [Father] out of the picture.”  County counsel again interjected that the Department only recommended supervised visitation.  The court responded:  “Well, we can offer things and—just for example, supervised visitation, meaning by whom, where, what terms, conditions.”

When the court reviewed the findings and orders on a preprinted form listing the Department’s recommendations, Father’s counsel again requested reunification services.  The court stated there was a third sort of service which was not family maintenance or family reunification, which Mother’s counsel characterized as “[n]ormalization services.”  When county counsel said such services were not “legal,” the court responded that there was “certainly a lawful ability to address the best interests of the child” by “attempt[ing] to normalize a relationship with a parent.”  When the court indicated it was going to strike the portion of the order providing no reunification services for Father, county counsel responded that the case would have to be continued for development of a case plan.  The court made clear that, under section 361.2, “relationship normalization” would be more accurate than family reunification services for Father.

Mother’s counsel suggested the visitation portion of the case plan could be modified to say that before Father could request unsupervised visitation, the court would “like to see” certain things, while “still not . . . ordering reunification services.”  The court responded:  “That should work.”  Father’s counsel said, “that then removes any obligation of the Department to assist [Father] or provide the referrals.”  The court replied:  “[T]hat’s a different question. . . . [S]o if your suggestion is that the Department

10

would have the obligation, meaning to do the legwork and [a] financial obligation to do these items, I'm not so sure that's so. . . . So that's different. It's [Father]'s ability to take steps to do things whereby, in essence, the [supervised visitation] order is either modified or lifted . . . but at this juncture, it would be, as [Mother's counsel] suggested, I think very appropriate to include under visitation planned actions that [Father] may take to, in essence, return to request unsupervised visitation, because we are providing supervised visitation at the outset." The court said "what I'm not doing is placing the burden on the Department [¶] . . . [¶] [b]ecause it's not family maintenance. It's not family reunification." When Father's counsel returned to section 361.2, the court said that what it thought was "most appropriate" was "normalization," saying it was "adopting" the term, as the "best we can provide."

The court's written dispositional findings and orders, filed on March 19, 2015, provided that "no reunification services" were to be provided to Father, as reunification services were not in Vanessa's best interests. The court ordered Vanessa removed from Father's custody, found that return to his custody would create a substantial risk of detriment, ordered placement with Mother, ordered family maintenance services for Mother, and provided that visitation between Vanessa and Father could only occur "[a]s stated in the case plan, as amended 3.13.[15]." The court further found that ICWA did not apply and no new information had been received regarding Indian ancestry. Father filed a timely notice of appeal.[7]

---

[7] Father also filed a premature notice of appeal from the jurisdictional findings and orders. (§ 395, subd. (a)(1) ["[a] judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment"].) "In dependency cases, the dispositional order is generally the first appealable order. [Citations.] However, jurisdictional findings and other orders entered before the dispositional hearing are generally reviewable on appeal from the dispositional order." (*In re M.C.* (2011) 199 Cal.App.4th 784, 801.) Originally the two notices of appeal were assigned separate appeal numbers. However, we ordered all proceedings to be conducted in appeal No. A143897.

11

## II.    DISCUSSION

Father contends that the disposition order must be reversed because:  (1) the court abused its discretion by failing to order reunification services for Father; and (2) the court failed to ensure proper inquiry and notice under ICWA.  We reject both arguments.

A.    *Reunification Services*

Father contends that the court abused its discretion by refusing to order reunification services "or other services" for Father, even though it also found it in Vanessa's best interest for him to receive counseling and work towards "normalization" of the relationship.  Father's argument rests on a misunderstanding of the record and the juvenile court's authority.

Reunification services are generally required when a child is removed from parental custody.  (§ 361.5, subd. (a).)  However, when a juvenile court places a dependent child with the noncustodial parent pursuant to section 361.2, it has *discretion*, but is not required, to order reunification services to the former custodial parent.  (See § 361.2, subd. (b); *In re Gabriel L.* (2009) 172 Cal.App.4th 644, 651; *In re Erika W.* (1994) 28 Cal.App.4th 470, 475–478 (*Erika W.*).)  "If the court places the child with the noncustodial parent, the court initially has three alternatives.  The court may order the noncustodial parent to assume custody of the child, enter a custody order , and terminate juvenile court jurisdiction.  (§ 361.2, subd. (b)(1).)  It may continue juvenile court jurisdiction and require a home visit within three months, after which the court may make orders as provided in subdivision (b)(1), (2) or (3).  (§ 361.2, subd. (b)(2).)  Or the court may order reunification services to be provided *to either or both parents* and determine at a later review hearing under section 366[] which parent, if either, shall have custody of the child.  (§ 361.2, subd. (b)(3).)"[8]  (*In re Adrianna P.* (2008) 166 Cal.App.4th 44, 55, italics omitted & added.)

---

[8] Section 361.2, subdivision (b), provides:  "If the court places the child with [the noncustodial] parent it may do any of the following: [¶] (1) Order that the parent become legal and physical custodian of the child.  The court may also provide reasonable visitation by the noncustodial parent.  The court shall then terminate its jurisdiction over

Under subdivision (b) of section 361.2, the juvenile court has discretion to grant or deny reunification services to the parent from whom custody is removed. (*In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1285; *In re Patricia T.* (2001) 91 Cal.App.4th 400, 406; *Erika W., supra*, 28 Cal.App.4th at pp. 475, 478.) Accordingly, we review for abuse of discretion. Under that standard, " ' " 'a reviewing court will not disturb [a] decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. . . .' " . . . "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) However, "[a] discretionary order that is based on the application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion, and is subject to reversal even though there may be substantial evidence to support that order." (*Mark T. v. Jamie Z.* (2011) 194 Cal.App.4th 1115, 1124–1125; accord, *In re Shannon M.* (2013) 221 Cal.App.4th 282, 289.)

---

the child. The custody order shall continue unless modified by a subsequent order of the superior court. The order of the juvenile court shall be filed in any domestic relation proceeding between the parents. [¶] (2) Order that the parent assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months. In determining whether to take the action described in this paragraph, the court shall consider any concerns that have been raised by the child's current caregiver regarding the parent. After the social worker conducts the home visit and files his or her report with the court, the court may then take the action described in paragraph (1), (3), or this paragraph. However, nothing in this paragraph shall be interpreted to imply that the court is required to take the action described in this paragraph as a prerequisite to the court taking the action described in either paragraph (1) or (3). [¶] (3) Order that the parent assume custody subject to the supervision of the juvenile court. In that case *the court may order that reunification services be provided to the parent or guardian from whom the child is being removed, or the court may order that services be provided solely to the parent who is assuming physical custody* in order to allow that parent to retain later custody without court supervision, *or that services be provided to both parents*, in which case the court shall determine, at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the child." (Italics added.)

13

Father attempts to show the court relied on incorrect legal assumptions. In our view, it is clear that the court understood its discretion. But Father suggests the record is ambiguous, pointing to the court's statement that, with the assistance of therapy, hopefully Father could eventually achieve a "normalized father-child-mother relationship" and "coparenting." Father maintains this is conclusive evidence the court believed Father and Vanessa could potentially reunify. We disagree.

"If the previously noncustodial parent can provide a safe and stable permanent home for the child and the evidence establishes that the other parent cannot, reunification services may be offered only to the previously noncustodial parent since this serves the Legislature's goals by placing the child in parental custody and providing for a safe and stable permanent home for the child. . . . [¶] If, on the other hand, the previously noncustodial parent who is now assuming custody does not appear to be an appropriate permanent placement for the child, and the previously custodial parent *has the potential to provide a safe stable permanent home for the child*, reunification services can be offered to the previously custodial parent in the hope that this parent will remedy his or her deficiencies and reunify with the child. . . . [¶] . . . [¶] . . . '[*T*]*he purpose of reunification services is to facilitate the return of a dependent child to parental custody*.' [Citations.] . . . When a child is placed in nonparental custody, reunification services are necessary to promote a possible return of the child to parental custody. However, when a child is placed in parental custody, this goal has already been met and therefore reunification services are not necessary." (*Erika W., supra,* 28 Cal.App.4th at pp. 476–478, italics omitted & added.)

As Father recognizes, in using the "coparenting" term, the court could have meant joint legal custody, rather than joint physical custody. (See *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 258 [affirmed trial court's dismissal of dependency case after ordering joint legal custody to both parents and sole physical custody to the father, with reasonable visitation for the mother].) Or the court could merely have been speaking to future orders Father might seek in family court. Section 361.2 specifically contemplates the possibility that dependency jurisdiction will be terminated within a short period after

14

placement with a noncustodial parent. (See § 361.2, subd. (b).) However, "[t]he parent who has lost physical custody of the minor under section 361.2 is not left without recourse. If the dependency court decides to terminate its jurisdiction, the noncustodial parent's interests in custody and visitation can be heard in the family law court." (*In re A.B.* (2014) 230 Cal.App.4th 1420, 1439.) The court made it sufficiently clear reunification services would not be ordered for Father because Vanessa could not be safely returned to his home.

The court did not abuse its discretion. Section 361.2 " 'expressly contemplates that reunification services will be offered only for the purpose of facilitating permanent parental custody of the child by one or the other parent.' " (*Erika W., supra*, 28 Cal.App.4th at p. 476.) The court did not believe Vanessa's recantation of her very serious allegations against Father. And Father remained in complete denial about his responsibility for the abuse. On the other hand, Mother showed good insight into Vanessa's challenges and little corroborated Vanessa's allegations against her, which the court did not believe. Accordingly, it was reasonable for the court to conclude Mother could provide a safe and stable permanent home for Vanessa while Father could not.

Alternatively, Father challenges the "normalization services" the court indicated would be more appropriate for Father. Father asserts such services are not "legal," relying on section 361.2, subdivision (b)(3), and the statement of county counsel before the court. Contrary to Father's and county counsel's suggestion, there is statutory and judicial support for "normalization services." The juvenile court may "order services for the purposes of improving the contact between the original custodial parent and the child rather than reunifying them." (*In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1489 (*Sarah M.*), overruled on other grounds in *In re Chantal S.* (1996) 13 Cal.4th 196, 204.) And the juvenile court can condition visitation on a parent's participation in counseling. (*Chantal S.*, at p. 200, 204 [relying on language now found in § 362, subd. (d)].)[9]

---

[9] Section 362, subdivision (d), provides: "The juvenile court may direct any reasonable orders to the parents . . . of the child who is the subject of any proceedings

The *Sarah M.* court determined the juvenile court did not abuse its discretion in implementing a plan designed not for reunification, but only to normalize visitation. (*Sarah M., supra,* 233 Cal.App.3d at p. 1501.) The court explained: "[There is] middle ground between reunification services and no services at all. [T]he juvenile court's broad discretion under section 361.2, subdivision (a) arguably gives it the opportunity to attempt to help the parents in creative ways. If the court may terminate outright its jurisdiction and award custody to the former noncustodial parent or go so far as to order services for both parents and reserve the custody question for a later date, we believe the court may also make orders which implicitly acknowledge it will not reunify the child with the original custodial parent and at the same time attempt to help that parent in maintaining or strengthening the contact with the child." (*Id.* at p. 1502.)

This is precisely what the court did here. Father has shown no abuse of discretion.

B.    *ICWA*

Father also contends that the disposition order must be reversed because the court failed to conduct an adequate inquiry into ICWA compliance. In particular, Father correctly observes that he indicated Vanessa might have Indian ancestry via a Shawnee tribe, yet nothing in the record indicates any notice or inquiry has been sent to any tribe. In fact, the court found ICWA does not apply and the Department repeatedly informed the court that neither parent reported any Indian ancestry. "In passing [ICWA], Congress identified two important, and sometimes independent, policies. The first, to protect the interests of the Indian child. The second, to promote the stability and security of Indian tribes and families. [Citations.] [ICWA] sets forth minimum federal standards, both substantive and procedural, for protecting these identified policies." (*In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1421.) We address the issue despite Father's failure to raise the issue below. Father cannot forfeit the ICWA notice requirements intended to

_____

under this chapter . . . . That order may include a direction to participate in a counseling or education program . . . . The program in which a parent . . . is required to participate shall be designed to eliminate those conditions that led to the court's finding that the minor is a person described by Section 300."

16

protect the interests of Indian tribes. (*In re Marinna J.* (2001) 90 Cal.App.4th 731, 733; *In re Desiree F.* (2000) 83 Cal.App.4th 460, 471.)

We agree with the Department that ICWA's notice requirements do not apply because, on the Department's recommendation, Vanessa was placed with Mother. ICWA provides: "[W]here the court knows or has reason to know that an Indian child is involved, *the party seeking the foster care placement of, or termination of parental rights to, an Indian child* shall notify . . . the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of . . . the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by . . . the tribe or the Secretary . . . ." (25 U.S.C. § 1912(a), italics added.)[10]

"By its own terms, [ICWA] requires notice *only when child welfare authorities seek permanent foster care or termination of parental rights*; it does not require notice *anytime* a child of possible or actual Native American descent is involved in a dependency proceeding." (*In re Alexis H.* (2005) 132 Cal.App.4th 11, 14 (*Alexis H.*), first italics added; accord, *In re J.B.* (2009) 178 Cal.App.4th 751, 758–759 (*J.B.*) [relying

_____

[10] Likewise, section 224.3, subdivision (a), provides: "The court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300, 601, or 602 is to be, or has been, filed is or may be an Indian child in all dependency proceedings and in any juvenile wardship proceedings *if the child is at risk of entering foster care or is in foster care.*" (Italics added.) Similarly, California Rules of Court, rule 5.480 provides that ICWA rules "appl[y] to most proceedings involving Indian children *that may result in an involuntary foster care placement*; guardianship or conservatorship placement; custody placement under Family Code section 3041; declaration freeing a child from the custody and control of one or both parents; termination of parental rights; or adoptive placement, including: [¶] (1) Proceedings under Welfare and Institutions Code section 300 et seq. . . . ." (Italics added.)

17

on *Alexis H.* reasoning to hold "ICWA does not apply to a proceeding to place an Indian child with a parent"].)

The *Alexis H.* court rejected the father's argument that a jurisdictional order should be reversed because ICWA notices had been deficient. (*Alexis H., supra,* 132 Cal.App.4th at p. 14.) The juvenile court had declared the minors dependents, but the social services agency recommended they continue to live with their mother, while she received family maintenance services and the incarcerated father received reunification services. (*Id.* at pp. 13–14.) The reviewing court explained: "When authorities remove a child of Native American descent from his home, the act promotes foster care or adoption by a Native American family in the hope of preserving tribal culture. If, however, authorities do not move the child to another family, the purpose does not come into play. . . . [¶] . . . Because the [agency] sought neither foster care nor adoption, the act *seemingly* does not apply." (*Id.* at p. 15, italics added.) It then observed: "Even if, however, [ICWA] applied to proceedings contemplating nothing more disruptive to an Indian child's home than family reunification services, the defective notices here were harmless error. [Citations.] The [agency] did not pursue foster care or adoption, instead recommending from the beginning that the children remain with their mother. . . . We are confident, however, that if the [agency] ever contemplates any additional action which might lead to foster care or adoption, it will ensure that the notices sent to the tribes contain complete and accurate information, including the names and birthplaces for the children and the names and accurate birthdates for mother and appellant." (*Id.* at p. 16.)

The Fourth District Court of Appeal held that ICWA notice requirements apply notwithstanding placement with the noncustodial parent. (*In re Jennifer A.* (2002) 103 Cal.App.4th 692, 699–702 (*Jennifer A.*).) However, the child in *Jennifer A.* was initially removed from the mother, temporarily placed in emergency shelter care and then in foster home care, before being ordered placed with the father. At the disposition hearing, the child welfare agency recommended that the child remain in foster care. (*Id.* at pp. 697–698.) The court explained: "[T]he issue of possible foster care placement was

18

squarely before the juvenile court. In advance of the dispositional hearing, [the agency] filed a report recommending . . . foster home care. [The agency] asks us to fixate on the result of the proceedings, i.e., the order that Jennifer be placed in the custody of her father, rather than on the possibility that the court could have ordered continued foster home care. . . . [¶] . . . [¶] . . . Jennifer was temporarily placed in a foster home and [the agency] was seeking to have the temporary placement continue. Jennifer had been removed from her custodial parent, her mother, who could not have Jennifer returned upon demand. The notice provisions of 25 United States Code section 1912(a) apply in involuntary proceedings of this nature." (*Id.* at pp. 700–701.)

*Alexis H., Jennifer A.,* and *J.B.* teach that ICWA applies when the child welfare agency seeks foster care placement or adoption for an Indian child. Unlike in *Jennifer A.*, the Department has never recommended foster care placement for Vanessa and there is no indication it will do so absent some change in circumstances. Vanessa has been cutting classes, refusing to complete homework, running away, making suicide threats, and not cooperating with her therapist. This indicates that Vanessa is deeply troubled, which is understandable given the allegations sustained, by clear and convincing evidence, against Father. Such behavior does not show, as Father suggests, that Vanessa is at risk of being removed from her placement with Mother. This case more closely resembles *Alexis H.* Father has not shown any violation of ICWA.

### III. DISPOSITION

The disposition order is affirmed.

_____
BRUINIERS, J.

WE CONCUR:


_____
JONES, P. J.


_____
NEEDHAM, J.